# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

TYLER KEATON,

     Plaintiff,

v.                                              2:23-cv-826-NPM

COMMISSIONER OF SOCIAL SECURITY,

     Defendant.

---

## ORDER

Plaintiff Tyler Keaton seeks judicial review of a denial of Social Security disability benefits. The Commissioner of the Social Security Administration filed the transcript of the proceedings (Doc. 12),[1] Keaton filed an opening brief (Doc. 15), the Commissioner responded (Doc. 20), and Keaton replied (Doc. 21). As discussed in this opinion and order, the decision of the Commissioner is affirmed.

## I.    Eligibility for Disability Benefits and the Administration's Decision

### A.    Eligibility

The Social Security Act and related regulations define disability as the inability to do any substantial gainful activity by reason of one or more medically determinable physical or mental impairments that can be expected to result in death or that have lasted or can be expected to last for a continuous period of not less than

---

[1]    Cited as "Tr." followed by the appropriate page number.

twelve months.[2] Depending on its nature and severity, an impairment limits exertional abilities like walking or lifting, nonexertional abilities like seeing or hearing, tolerances for workplace conditions like noise or fumes, or aptitudes necessary to do most jobs such as using judgment or dealing with people.[3] And when functional limitations preclude both a return to past work and doing any other work sufficiently available in the national economy (or an impairment meets or equals the severity criteria for a disabling impairment as defined in the regulatory "Listing of Impairments"), the person is disabled for purposes of the Act.[4]

## B.    Factual and procedural history

On July 11, 2019, Keaton applied for supplemental security income.[5]  (Tr. 53, 180, 428-29, 528). He asserted an onset date of March 1, 2018, alleging disability due to the following: bipolar disorder; anxiety; attention-deficit hyperactivity disorder (ADHD); anger problems; blackouts; schizophrenia; post-traumatic stress disorder (PTSD); obsessive-compulsive disorder (OCD); and multiple personalities.

---

[2]    *See* 42 U.S.C. §§ 416(i), 423(d), 1382c(a)(3); 20 C.F.R. § 416.905.

[3]    *See* 20 C.F.R. §§ 416.913(a)(2)(i)(A)-(D) (discussing the various categories of work-related abilities), 416.922(b) (providing examples of abilities and aptitudes necessary to do most jobs), 416.945(b)-(d) (discussing physical, mental, and other abilities that may be affected by an impairment).

[4]    *See* 20 C.F.R. § 416.911(a).

[5]    Keaton received supplemental security income as a child, but his benefits terminated in 2017, after it was determined that Keaton was no longer disabled. (Tr. 11, 178-79, 195). This decision was upheld on reconsideration and Keaton did not appeal. Thus, the disability determination became final.

(Tr. 180-81, 444). As of the alleged onset date, Keaton was almost 19 years old, with an eleventh-grade education. (Tr. 129, 180, 428, 449-50). Keaton previously worked at a McDonald's for a brief period of time. (Tr. 133-34, 449-50).

On behalf of the administration, a state agency[6] reviewed and denied Keaton's application initially on September 25, 2019, and upon reconsideration on December 18, 2019. (Tr. 11, 227, 236, 243). At Keaton's request, Administrative Law Judge (ALJ) Raymond Rodgers held a hearing on April 19, 2023. (Tr. 34, 123). On May 9, 2023, the ALJ issued an unfavorable decision finding Keaton not disabled. (Tr. 8- 25). Keaton's timely request for review by the administration's Appeals Council was denied. (Tr. 1-3). Keaton then brought the matter to this court, and the case is ripe for judicial review.

## C.    The ALJ's decision

The ALJ must perform a five-step sequential evaluation to determine if a claimant is disabled. 20 C.F.R. § 416.920(a)(1). This five-step process determines:

> (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether these impairments meet or equal an impairment listed in the Listing of Impairments; (4) if not, whether the claimant has the residual functional capacity ("RFC") to perform his past relevant work; and (5) if not, whether, in light of his age, education, and work experience, the claimant can perform other work that exists in significant numbers in the national economy.

---

[6]    In Florida, a federally funded state agency develops evidence and makes the initial determination whether a claimant is disabled. *See* 42 U.S.C. § 421(a); 20 C.F.R. § 416.903(a).

*Atha v. Comm'r, Soc. Sec. Admin.*, 616 F. App'x 931, 933 (11th Cir. 2015) (internal quotation omitted); *see also* 20 C.F.R. § 416.920(a)(4).

The governing regulations provide that the Social Security Administration conducts this "administrative review process in an informal, non-adversarial manner." 20 C.F.R. § 416.1400(b). Unlike judicial proceedings, Social Security Administration hearings "are inquisitorial rather than adversarial." *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1364 (11th Cir. 2018) (quoting *Sims v. Apfel*, 530 U.S. 103, 111 (2000) (plurality opinion)). "Because Social Security hearings basically are inquisitorial in nature, '[i]t is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits.'" *Id.* Indeed, "at the hearing stage, the commissioner does not have a representative that appears 'before the ALJ to oppose the claim for benefits.'" *Id.* (quoting *Crawford & Co. v. Apfel*, 235 F.3d 1298, 1304 (11th Cir. 2000)). "Thus, 'the ALJ has a basic duty to develop a full and fair record. This is an onerous task, as the ALJ must scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts.'" *Id.* (quoting *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015)).

Nonetheless, while the claimant is relieved of the burden of production during step five as to whether there are enough jobs someone like the claimant can perform, the claimant otherwise has the burdens of production and persuasion throughout the process. *See* 20 C.F.R. § 416.912 (providing that the claimant must prove disability);

*see also Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (noting the regulations "place a very heavy burden on the claimant to demonstrate both a qualifying disability and an inability to perform past relevant work"). In short, the "overall burden of demonstrating the existence of a disability as defined by the Social Security Act unquestionably rests with the claimant." *Washington*, 906 F.3d at 1359 (quoting *Doughty v. Apfel*, 245 F.3d 1274, 1280 (11th Cir. 2001)).

At step one of the evaluation, the ALJ found Keaton had not engaged in substantial gainful activity since July 11, 2019, the application date. (Tr. 13). At step two, the ALJ characterized Keaton's severe impairments as: bipolar disorder; borderline intellectual functioning; personality disorder; anxiety; schizophrenia; and depression. (Tr. 14). At step three, the ALJ determined Keaton did not have an impairment or combination of impairments that met or medically equaled the severity of an agency-listed impairment. (*Id.*).

As a predicate to step four, the ALJ arrived at the following RFC:

The claimant maintains the following residual functional capacity: able to understand, remember, and carry out simple tasks while maintaining attention and concentration for 2 hours at a time before requiring a regular scheduled break; no fast-paced production; goal-based production/work measured by end result not pace work; low stress work defined as only occasional decision-making and only occasional changes in the work setting; occasional interaction with coworkers and supervisors; and no interaction with the public.

(Tr. 16).[7] Given an absence of any past relevant work, the ALJ proceeded to step five and found that Keaton could perform work for which a significant number of jobs exist in the national economy. (Tr. 23-24). In support, a vocational expert testified that an individual of Keaton's age, education, work experience, and RFC can perform jobs within the following representative occupations:

- *Industrial Cleaner*, DOT #381.687-018, with 26,000 jobs in the national economy;

- *Warehouse Worker*, DOT #922.687-058, with 20,000 jobs in the national economy; and

- *Laundry Worker*, DOT #361.684-014, with 15,000 jobs in the national economy.

(Tr. 24).[8] Thus, for purposes of the Act, the ALJ concluded Keaton was not disabled from July 11, 2019, the date Keaton's application was filed, through May 9, 2023, the date of decision. (Tr. 24-25).

## II.   Analysis

The issue on appeal is whether substantial evidence supports the ALJ's conclusion that the intensity, persistence, and limiting effects of Keaton's

---

[7]      While the ALJ found that Keaton suffered from certain mental impairments, he did not find Keaton had any physical impairments. (Tr. 21).

[8]      The DOT numbers refer to the *Dictionary of Occupational Titles* and its detailed explanations concerning each occupation's requirements. These descriptions include exertion and skill levels. Exertion refers to the work—in a purely physical sense—that the job requires, and it is divided into five categories: sedentary, light, medium, heavy, and very heavy. Skill refers to how long it takes to learn the job, and it is divided into three categories: unskilled, semiskilled, and skilled.

impairments were not as disabling as alleged, and thus, did not preclude simple, low-stress work involving very little interaction with others.

## A.   Standard of review

The court "may not decide the facts anew, make credibility determinations, or reweigh the evidence." *Buckwalter v. Acting Comm'r of Soc. Sec.*, 997 F.3d 1127, 1132 (11th Cir. 2021). While the court must account for evidence both favorable and unfavorable to a disability finding and view the evidence as a whole, *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), the court's review of the administration's decision is limited to determining whether "it is supported by substantial evidence and based on proper legal standards." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Goode v. Comm'r of Soc. Sec.*, 966 F.3d 1277, 1280 (11th Cir. 2020) (quoting *Crawford*, 363 F.3d at 1158)).

"[T]he threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). The inquiry is "case-by-case," and "defers to the presiding ALJ, who has seen the hearing up close." *Id*. at 1157. In other words, a "presumption of validity attaches" to the ALJ's factual findings. *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987). And if supported by substantial evidence, the ALJ's findings of fact are conclusive. 42 U.S.C. § 405(g). This means the district

court will affirm, even if the court would have reached a contrary result as finder of fact, and even if the court finds that the evidence "preponderates against" the agency's decision. *Noble v. Comm'r of Soc. Sec.*, 963 F.3d 1317, 1323 (11th Cir. 2020) (quoting *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991)).

### B. The ALJ properly considered the effects of Keaton's impairments, and the RFC is supported by substantial evidence.

Keaton argues that because the ALJ discounted his statements and certain medical opinions of record about his severe limitations, the ALJ failed to fully appreciate the "total limiting effects" of his severe impairments. (Doc. 15 at 12; Doc. 21 at 1). According to Keaton, the RFC is based upon a highly selective, and not always accurate, version of the facts. (Doc. 15 at 16). Thus, Keaton asserts the RFC is not supported by substantial evidence. (Doc. 21 at 4).

A claimant's RFC is the most he can still do despite his limitations. 20 C.F.R. § 416.945(a). To determine a claimant's RFC, an ALJ must "consider the limiting effects of all [the claimant's] impairment(s), even those that are not severe[.]" 20 C.F.R. § 416.945(e). In other words, "[a]n RFC determination is an assessment, based on all relevant evidence, of a claimant's remaining ability to do work despite his impairments." *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 C.F.R. § 404.1545(a)). "In making this holistic assessment, the ALJ considers evidence such as the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; the type, dosage,

effectiveness, and side effects of any medication or other treatment the claimant takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; any measures the claimant uses or has used to relieve pain or symptoms; and any other factors concerning the claimant's functional limitations and restrictions." *Cnossen v. Comm'r of Soc. Sec.*, No. 2:22-cv-574-KCD, 2023 WL 5013394, *4 (M.D. Fla. Aug. 7, 2023).

Contrary to Keaton's claim, the record shows that the ALJ considered the "total limiting effects" of his impairments and the court is satisfied that the ALJ's findings are supported by substantial evidence. The ALJ considered Keaton's testimony concerning the intensity, persistence, and limiting effects of his anxiety, panic attacks, irritability, difficulties paying attention, mood disturbances, and difficulty in handling stress and changes in routine. (Tr. 17, 129-47, 459-66). And while the ALJ found that Keaton's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the ALJ concluded that Keaton's statements about the effects of the symptoms were not supported by his treatment history or objective medical findings. (Tr. 17). Then the ALJ outlined the evidence that supports the RFC—nothing more is required.

Still, Keaton argues that his subjective complaints establish even greater limitations than that set forth in the ALJ's RFC. (Doc. 15 at 12-13). Keaton points

to his testimony that he must self-isolate to control his anger; he does not go outside his home to socialize due to anxiety with crowds; the first time he tried to work, the pressure got to him, and he gave up and walked away; and even though he plays with his children, there are days he has to remove himself from spending time with them. (Tr. 132, 134, 136). Keaton also asserts that his testimony is consistent with his prior statements in a function report, in which he described a limited ability to work due to anger and irritation; an inability to control anger, spell, or pay bills; and anxiety attacks that can last up to twenty minutes, which can be triggered by changes in environment or "nothing in particular." (Tr. 455, 459, 462). Keaton alleges the ALJ failed to address this evidence when formulating the RFC. (Doc. 15 at 12-13).

"[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in [his] decision, so long as the ALJ's decision . . . is not a broad rejection which is not enough to enable [the reviewing court] to conclude that the ALJ considered [the claimant's] medical condition as a whole." *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (internal quotation marks and citation omitted). Nevertheless, an ALJ must clearly articulate explicit and adequate reasons for rejecting a claimant's testimony about symptoms. *Foote*, 67 F.3d at 1561-62. That is what the ALJ did here.

Although he did not cite to all of the evidence specifically, the ALJ made clear that he considered Keaton's hearing testimony, his function report, and his medical

condition as a whole. (Tr. 17-23, 123-60, 459-66). For example, the ALJ considered Keaton's reports of anxiety symptoms, including panic attacks, along with feelings of irritability and anger, poor attention span, mood swings, blacking out, being suicidal, suffering from depression, and having difficulty in changes to routine. (Tr. 17-20, 613-20, 623-47, 684-89, 709-61, 762-75, 791-808). The ALJ then explained why the intensity, persistence, and limiting effects of Keaton's symptoms—as alleged by Keaton—were not supported by the treatment history and medical findings, thus providing clear, articulate reasons for discounting Keaton's testimony. *See Foote*, 67 F.3d at 1561-62. And, even so, the ALJ otherwise accounted for Keaton's symptoms in the RFC, noting that "although the medical evidence of record does not support the claimant is as functionally limited as he alleges, the residual functional capacity has been reduced to account for his impairments, subjective complaints, and supported limitations." (Tr. 23). While Keaton may believe there is evidence of record that would support his disability claim, the "court will not disturb [the ALJ's] clearly articulated finding about [Keaton's] symptoms [since] it is supported by substantial evidence." *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014).

Keaton also takes issue with ALJ's use of evidence about lack of treatment, Keaton's daily activities, normal exam findings, and the state-agency and consultative exam findings. (Tr. 15 at 14-17). With respect to a lack of treatment,

the ALJ found that Keaton failed to show he was receiving specialized treatment for his mental-health impairments and associated symptoms. The ALJ noted Keaton's claim that he could not afford treatment but found that records showed he was insured and able to pay for costly cannabis treatment, and that he was non-compliant with his prescription medication despite the medications working when Keaton took them. (Tr. 21).

Keaton asserts that the ALJ failed to consider contrary evidence showing Keaton was under the assumption that he did not have insurance (even if he did) and he truly believed he could not afford treatment. Thus, Keaton argues he was excused from noncompliance with prescribed treatment due to lack of funds or insurance. (Doc. 15 at 14). Keaton also challenges the ALJ's statement that cannabis treatment is costly compared to traditional treatment, contending that the ALJ has no basis to make this determination. (*Id.* at 15). Lastly, Keaton asserts that the ALJ ignored the fact that any noncompliance with prescription medications could be due to Keaton's psychiatric disorders, which often cause people not to adhere to medications due to side effects, poor efficacy, and any underlying impairments themselves. (*Id.*)

The flaw in Keaton's appeal is his isolated attacks on portions of the ALJ's decision. In doing so, he misses the proverbial forest through the trees. For instance, had the ALJ's "sole ground" for denial of benefits been based upon Keaton's noncompliance with prescribed medical treatment and the record showed Keaton

was financially unable to comply with that treatment, then the ALJ would have had to determine whether Keaton in fact could afford the treatment. *Douglas v. Comm'r, SSA*, 832 F. App'x 650, 657 (11th Cir. 2020). But this is not the case. Rather, the ALJ formulated an RFC based upon Keaton's normal cognitive functioning and mood during several medical examinations (Tr. 17-21, 617, 635, 773); his coherent thoughts, fair insight and judgment, normal speech and psychomotor functioning (even when not taking prescribed medications) (Tr. 20, 740-43); his decision to pursue costly cannabis treatment instead of mental health treatment (Tr. 21, 545, 691-92); his wide-ranging daily activities (Tr. 21, 131-36, 460-63); state-agency doctor's opinions that Keaton could perform simple and some complex tasks in a work setting even with likely "problems with authority" (Tr. 21-22, 188-90, 205-07); the consultative opinion of Dr. Paula Bowman that Keaton could perform simple tasks with his mild to moderate mental impairments (Tr. 22, 542-46); and the consultative opinion of Dr. Mark Dayboch, who found Keaton had a mild cognitive impairment that allowed him to perform simple, repetitive tasks. (Tr. 22-23, 639-42).

Furthermore, the ALJ relied on substantial evidence showing that Keaton failed to follow prescribed treatment despite having the insight to know when he needed medical assistance. (Tr. 21). For instance, Keaton sought help when he was having difficulties in his relationships (Tr. 18, 685); he was keenly aware that he was

supposed to be taking medication for depression, but did not take it and refused anti-anxiety medication (*Id.*, 686); Keaton stopped taking psychiatric medication because he was not eating or sleeping well (Tr. 722); and Keaton expressed that he "rarely needs help when given instructions from [*sic*] doctor or pharmacist." (Tr. 765). Therefore, the ALJ did not commit reversible error here.

Next, Keaton claims that the ALJ erred by ignoring his statements about his daily activities that are relevant to his limitations, such as having to self-isolate when he is having a bad day to avoid being angry or violent, not being able to clean his own room or cook without reminders to stay on task, and not being able to make his own appointments or pay bills. (Doc. 15 at 15-16). While "the ALJ was required to consider all of the evidence presented, including [Keaton's] own description of [his] daily activities, . . . the ALJ was not required to expressly discuss it." *Tibbetts v. Comm'r of Soc. Sec.*, No. 2:20-cv-872-SPC-MRM, 2021 WL 6297530, *15 (M.D. Fla. Dec. 21, 2021), *report and recommendation adopted*, 2022 WL 61217 (Jan. 6, 2022). Even if the ALJ did not explicitly reference every statement about daily activities, such as the ones Keaton cites, the ALJ considered them generally. For instance, the ALJ acknowledged Keaton's reports of panic attacks, irritability, and difficulty in handling stress and paying attention, and then compared these reports with evidence that Keaton was also able to socialize over the phone, go out alone, maintain relationships with his girlfriend and grandparents, care for his children

(ages two and seven), and play video games, rap, and go shopping. (Tr. 15, 23, 459-66, 638-47). At bottom, the ALJ's characterization of Keaton's testimony about his daily activities is supported by substantial evidence in the record, even if Keaton does not believe it's the most favorable characterization. *See Carr v. Comm'r of Soc. Sec.*, No. 22-12989, 2024 WL 94149, *3 (11th Cir. Jan. 9, 2024). Thus, the ALJ did not err.

Keaton also takes issue with the ALJ's reference to "normal exam findings" as support for not fully crediting Keaton's self-described limitations. (Doc. 15 at 16). Keaton accuses the ALJ of "cherry-picking" the record for evidence of non-disability while overlooking contradictory evidence. (*Id.* at 16-17). But noticeably absent from Keaton's argument is any evidence of the same. "There is a fine line between evaluating the decision for 'cherry-picking' and reweighing the evidence." *Frangione v. Comm'r of Soc. Sec.*, No. 6:20-cv-1298-GJK, 2021 WL 9569655, *5 (M.D. Fla. Sept. 24, 2021). Keaton asks the court to cross that line. He argues:

> The ALJ rejected Plaintiff's testimony by relying on some mental status examinations that revealed some normal findings. The ALJ acknowledged that he presented as pleasant, cooperative, and willing, then contemporaneously acknowledged that these records also documented that his thoughts were notable for auditory hallucinations, paranoia, racing, and tangential thoughts . . . It is well-settled that an ALJ must consider the fact that certain types of impairments, such as mental impairments, tend to wax and wane in a variable presentation. In such cases, the ALJ's decision is not supported by substantial evidence if he excludes consideration of abnormal examination findings and cites only (or mainly) the claimant's 'good days.'

(Doc. 15 at 16-17) (citation omitted).

But the ALJ considered Keaton's abnormal findings and accounted for them in the RFC, to the extent he found them credible and supported by medical and other evidence. Even though the ALJ may not have expressly mentioned "waxing and waning" symptoms, the ALJ reviewed evidence of the same. To be sure, the ALJ discussed treatment records from 2019 through 2022, and in doing so, noted that Keaton's mood and affect were described as depressed, elevated, anxious, irritable and labile (at times), his thoughts were notable for auditory hallucinations, paranoia, and racing, and that Keaton had a poor attention span and was distractable with limited, poor, or fair judgment. (Tr. 17-21, 613-20, 623-47, 684-89, 709-61, 762-75). On the other hand, the ALJ noted that Keaton's mood was also calm and neutral with a normal affect, his thoughts were at times coherent, logical, and goal directed, and he was able to sustain attention and focus with an impulse control within the normal limits. (*Id.*). The ALJ pointed to evidence showing Keaton had not always been on psychotropic mediation, and despite being diagnosed with schizophrenia, Keaton's medical evaluations did not show ongoing auditory or visual hallucinations or ongoing abnormal thought processes. (Tr. 21, 684-89, 709-75, 791-808). And the ALJ observed that when Keaton took his prescribed medications, they worked to reduce symptoms. (*Id.*)

The ALJ also considered Keaton's September 2019 psychometric testing that revealed "borderline intellectual functioning," and arrived at an RFC that was even

more restrictive than the assessment of medical professionals who found Keaton able to understand and follow simple and some complex instructions. (Tr. 17, 22, 623-30). So, rather than "cherry-picking," the ALJ considered both favorable and unfavorable evidence and concluded that Keaton did not have "limitations of function consistent with a complete inability to perform all work activity." (Tr. 14, 20).

While there is evidence in the record to support Keaton's disability claim, "the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." *Adefemi v. Ashcroft*, 386 F.3d 1022, 1027 (11th Cir. 2004). So the court must decline the invitation to reweigh the evidence and potentially come to a different conclusion. *See Borges v. Comm'r of Soc. Sec.*, 771 F. App'x 878, 882 (11th Cir. 2019) ("To the extent that [plaintiff] points to other evidence that would undermine the ALJ's RFC determination, her contentions misinterpret the narrowly circumscribed nature of this Court's appellate review, which precludes it from re-weighing the evidence or substituting its own judgment for that of the Commissioner.").

Keaton's arguments regarding the state-agency and consultative exam findings fare no better. Keaton claims that in formulating the RFC, the ALJ failed to fully account for Dr. Michael Plasay and Dr. Wendy Silver's state-agency exam findings that "problems with authority figures [are] likely," and that Keaton is

"moderately limited" in his ability to accept instructions and respond appropriately to criticism from supervisors. (Doc. 15 at 18; Tr. 189-90, 205-07). Specifically, Keaton argues that the ALJ's RFC assessment—that Keaton may have occasional interaction with supervisors—is described in *quantitative*, not *qualitative* terms, and does not take into account whether Keaton is employable due to problems with authority. (Doc. 15 at 18).

But Keaton ignores that the fact that both state-agency psychologists opined that despite this moderate limitation, Keaton could perform "vocational tasks comprised of simple, recurrent steps at an acceptable rate under normal supervision, and complete a normal workday/week without an excessive number of interruptions from psychological symptoms," and was "not significantly limited" in his ability to sustain ordinary routine without supervision. (Tr. 187-90, 206-07). The ALJ considered these opinions holistically and—in Keaton's favor—found them "partially persuasive" because Keaton was more limited with respect to following instructions and social functioning. (Tr. 22). Nevertheless, the ALJ incorporated these opinions in the RFC assessment and the hypothetical question to the VE by limiting Keaton to no more "than occasional interaction with coworkers and supervisors." (Tr. 149-50). And an RFC limitation of "occasional interaction with co-workers and supervisors" sufficiently accounts for a "moderate limitation" in Keaton's ability to interact. *See Statum v. Acting Comm'r of the SSA*, No. 3:14-cv-

1297-J-MCR, 2017 WL 4744706, *3 (M.D. Fla. Feb. 27, 2017), *appeal dismissed*, 2017 WL 5053957 (11th Cir. July 12, 2017); *see also Whitfield v. Colvin*, 1:13-CV-00199-MP-CAS, 2014 WL 2932661, *11 (N.D. Fla. June 27, 2014) ("Consistent with the evidence, the ALJ accounted for Plaintiff's moderate difficulties in social functioning and regarding his concentration, persistence, or pace by including, among other factors, in his hypothetical question to the vocational expert that Plaintiff 'mentally would be limited to simple, routine, repetitive tasks; concentrate and persist for two hour segments; would be limited to occasional changes in the work setting, and occasional interactions with the public, coworkers and supervisors . . . .'").

Turning to Dr. Paula Bowman's March 2018 consultative report, Keaton argues that to the extent the ALJ found Dr. Bowman's opinion persuasive, the ALJ's RFC failed to account for Dr. Bowman finding he was moderately limited in regard to difficulty in sustaining an ordinary routine and regular attendance: regulating emotions, controlling behavior, and maintaining well-being; and being aware of normal hazards and taking precautions. (Doc. 15 at 19-20).

But as we have stated before, "finding an opinion persuasive does not mean it is controlling." *Dykes v. Comm'r of Soc. Sec.*, No. 2:21-cv-626-JES-NPM, 2022 WL 4229261, *5 (M.D. Fla. Aug. 1, 2022), *report and recommendation adopted*, 2022 WL 3655419 (Aug. 25, 2022) (citing 20 C.F.R. § 404.1520c(a) ("We will not defer

or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources.")). And the regulations do not require ALJs to adopt every part of an opinion that they otherwise find persuasive. *See Sesler v. Comm'r of Soc. Sec.*, No. 8:20-cv-2835-DNF, 2021 WL 5881678, *6 (M.D. Fla. Dec. 13, 2021); *Misla v. Comm'r of Soc. Sec.*, No. 6:20-cv-1076-DCI, 2021 WL 2417084, *2 (M.D. Fla. June 14, 2021). Moreover, the assessment of a claimant's functional capacity is within the exclusive province of the ALJ. *See Wolff v. Comm'r of Soc. Sec.*, No. 2:22-cv-177-SPC-NPM, 2023 WL 1971935, *6 (M.D. Fla. Jan. 27, 2023), *report and recommendation adopted*, 2023 WL 1967586 (Feb. 13, 2023) (citing 20 C.F.R. §§ 404.1546(c), 416.946(c); *accord Beegle v. Soc. Sec. Admin., Comm'r*, 482 F. App'x 483, 486 (11th Cir. 2012) ("A claimant's [RFC] is a matter reserved for the ALJ's determination, and while a physician's opinion on the matter will be considered, it is not dispositive.")). Therefore, to the extent the ALJ did not adopt every limitation opined by Dr. Bowman, the ALJ was not required to.

Similarly, Dr. Cheryl Kasprzak opined that Keaton does not "possess the skills and cognitive capacity to manage finances independently," and Keaton argues that her failure to provide a function-by-function assessment did not provide a basis for the ALJ to disregard this consultative opinion. (Doc. 15 at 20; Tr. 625). Not so. An ALJ may discount the weight afforded to a doctor's assessment when the opinions

are "vague, and [do] not provide any function-by-function assessment of the claimant's ability to perform work-related mental activity." *Clough v. Comm'r of Soc. Sec.*, 813 F. App'x 436, 441 (11th Cir. 2020). Accordingly, this argument fails.

Finally, Keaton argues the ALJ failed to build an accurate and "logical bridge" between the evidence and the RFC, (Doc. 15 at 3; Doc. 21 at 4). But there is nothing illogical about not fully accepting the claimant's subjective account, discounting certain opinions for clearly stated and substantively supported reasons, and arriving at a disability finding with which the claimant does not agree. As discussed above, the ALJ thoroughly addressed the evidence and explained how he determined the RFC. Overall, the ALJ recognized that Keaton exhibited several severe limitations that could affect his ability to perform basic work activities. (Tr. 14). The ALJ assessed the relevant evidence including the objective medical evidence, Keaton's daily activities, and his hearing testimony and other self-reports. (Tr. 17-23). From there, the ALJ formulated an RFC and determined that Keaton is not disabled for purposes of the Act. Substantial evidence logically supports this conclusion.

## III.  Conclusion

Upon consideration of the submissions of the parties and the administrative record, substantial evidence supports the ALJ's decision, and there was either no error or no harmful error in the ALJ's application of the correct legal standards. Accordingly, the decision of the Commissioner is **AFFIRMED** pursuant to sentence

four of 42 U.S.C. § 405(g), and the clerk is directed to enter judgment in the
Commissioner's favor, terminate all scheduled events, and close the case.

**ORDERED** on September 30, 2024

_____
NICHOLAS P. MIZELL
United States Magistrate Judge